COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Huff, Athey and Friedman
Argued by videoconference

STEPHANIE NICHOLE PENN

MEMORANDUM OPINION* BY
v.      Record No. 0529-21-3      JUDGE FRANK K. FRIEDMAN
MARCH 8, 2022

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF MARTINSVILLE
G. Carter Greer, Judge

Kelsey Bulger, Senior Assistant Public Defender, for appellant.

Leah A. Darron, Senior Assistant Attorney General (Mark R.
Herring,[1] Attorney General, on brief), for appellee.


Stephanie Nichole Penn ("appellant") appeals from her conviction of felony child abuse

under Code § 18.2-371.1(B), arguing that the circuit court erred in three ways: by admitting

surveillance video into evidence, by admitting a knife into evidence, and by finding the evidence

sufficient to convict appellant. We affirm the trial court's rulings.

I. BACKGROUND

"On appeal of criminal convictions, we view the facts in the light most favorable to the

Commonwealth, and [we] draw all reasonable inferences from those facts." *Payne v.*

*Commonwealth*, 65 Va. App. 194, 198 (2015).

On January 25, 2020, appellant met Quincy Penn ("Quincy"), the father of her child, at a

Valero/FasMart ("Valero") gas station. Valero surveillance cameras captured the interaction

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Jason S. Miyares succeeded Mark R. Herring as Attorney General on January 15, 2022.

between Quincy and appellant. Quincy parked at a gas pump and got out of the car holding "L.P.," the then-seven-month-old daughter he shares with appellant. While still holding L.P., Quincy looked away at something off-camera, appeared to be quite startled, and L.P. dropped out of the camera's view. Appellant then appeared on camera and lunged toward Quincy with an object in her hand. She chased him around the gas pumps, swinging the object at him in a slashing motion. Appellant then ran back to Quincy's vehicle and picked L.P. up; in total, seven seconds passed from the time L.P. disappeared from view to the time appellant retrieved her. Quincy took the object from appellant's hand; appellant still struck at Quincy with her fist while holding L.P. in her arms.

Corrie Coleman was the Valero manager on duty on January 25, 2020. She watched the surveillance video footage when the police arrived on January 25, 2020, and she watched it again prior to the trial. She described it as "a fair and accurate depiction of what happened outside [the] store" and stated that the video was "tamper-proof" and could not be altered. Coleman also stated that she had watched "the live feed of the incident" from inside the store and that what was shown on the video footage was not "less than" or "different" from what she had seen on the live feed. On cross-examination, Coleman clarified that she had been stocking shelves when the incident occurred, that the cashier on duty notified her of an altercation in the parking lot, and that she then got up and saw the altercation "live," but that she did not actually watch it live on the cameras.

Austin Rigney ("Rigney"), another customer at Valero that evening, was pumping gas when he heard appellant and Quincy arguing. He turned and saw L.P. lying face-down on the ground. Rigney later watched the Valero surveillance video and confirmed that it was "a fair representation of [him] in the parking lot."

Martinsville Police Sergeant Washburn made contact with appellant and L.P. at the hospital following the Valero incident. There were red marks on L.P.'s forehead, which appellant said were from the incident at the Valero. Appellant later went to the Martinsville Police Department and spoke with Sergeant Washburn again. She told him that she had "a scalpel-type knife out as she approached Quincy in the parking lot when he dropped the child, and that she did hit Quincy several times because he had dropped the child."

While appellant was at the police department, she made a phone call from a room with audio and video recording capabilities. Martinsville Police Officer J. Clark later watched the video of appellant's call and heard appellant say: "Me and Sam got to fighting at Valero. I was the primary aggressor. I had a blade in my hand and went towards him. They're locking me up because I was the primary aggressor." Officer J. Clark testified that he knew "Sam" to be Quincy Penn. On cross-examination, Officer J. Clark testified that appellant also stated "that they are saying that I'm the primary aggressor."

Martinsville Police Officer E. Clark examined the crime scene and saw what appeared to be baby vomit in the area of the parking lot where appellant was holding L.P. after the altercation ended. Officer E. Clark also watched the Valero video footage of the incident and saw Quincy retrieving an item from appellant and placing it in the driver's side door of his car. A search warrant was obtained for Quincy's vehicle, and Sergeant Washburn and Officer E. Clark executed the warrant and found a "knife/razor-type cutting utensil" in the driver's side door of the car. The knife was introduced into evidence over appellant's objection, and the trial judge described it as "basically a straight razor, the type that a barber would use."

The trial judge found appellant guilty of felony child abuse. Appellant was sentenced to twelve months of incarceration, suspended after the time she had already served, and was fined $300. This appeal followed.

II. ANALYSIS

Appellant challenges the admissibility of the Valero surveillance video and the knife that was found in Quincy's vehicle. She also argues that the evidence was insufficient to prove "a willful act or omission" or "a reckless disregard for human life."

The admissibility of evidence is subject to an abuse of discretion standard of review. *Thomas v. Commonwealth*, 279 Va. 131, 168 (2010). "In reviewing an exercise of discretion, we do not substitute our judgment for that of the trial court. Rather, we consider only whether the record fairly supports the trial court's action." *Beck v. Commonwealth*, 253 Va. 373, 385 (1997).

## A. Admissibility of the Video

Appellant argues that the admission of the Valero video violated Virginia Rule of Evidence 2:901, which states: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the thing in question is what its proponent claims."

At trial, appellant objected to the introduction of the Valero video, arguing that the video "skips" and therefore was "not a fair and accurate depiction of what was going on." Based on this objection, the Commonwealth asked Coleman whether she had watched the live feed of the video. Coleman stated that she had watched it, that nothing on the video shown in court was "less than" or "different" from the live feed, and that nothing was missing from the video. Rigney also had stated that the video was "a fair representation" of himself in the parking lot.

"The admissibility of a videotape, like a photograph, rests within the sound discretion of the trial court. If the court determines that the information on the tape is relevant and that the probative value of its contents outweighs any prejudicial effect, it should be admitted." *Brooks v. Commonwealth*, 15 Va. App. 407, 410 (1992) (citing *Stamper v. Commonwealth*, 220 Va. 260, 270-71 (1979)). Once the proponent of the evidence has established its admissibility, "any gaps

in the evidence are relevant to the trier of fact's assessment of its weight rather than its admissibility." *Church v. Commonwealth*, 71 Va. App. 107, 122-23 (2019) (citing *Kettler & Scott, Inc. v. Earth Tech. Cos.*, 248 Va. 450, 459 (1994)). This Court has previously noted that, when "a witness with knowledge testified that the videotape was what it claimed to be, the Commonwealth did not need to prove the accuracy of the process that produced it." *Wilson v. Commonwealth*, 29 Va. App. 236, 239 (1999). Furthermore, "a photograph which is verified by the testimony of a witness as fairly representing what that witness has observed is admissible in evidence and . . . it need not be proved by the photographer who made it." *Ferguson v. Commonwealth*, 212 Va. 745, 746 (1972) (citing *State Farm Ins. Co. v. Futrell*, 209 Va. 266 (1968)).

Here, Coleman testified that she witnessed at least part of the altercation between appellant and Quincy and that the video was an accurate representation of the events she had seen. Rigney similarly confirmed this, although he acknowledged that he only briefly turned to see the incident as it occurred. Though neither Rigney nor Coleman saw the entire incident, this level of proof is not required to authenticate video evidence.[2] *See Clagett v. Commonwealth*, 252 Va. 79, 87 (1996) (finding a photograph of money to have been authenticated where a police officer identified a keyring in the photo as having been taken from the defendant at the same time the money was taken from him, even though the officer could not positively identify the money in the photo as being the defendant's).

Furthermore, even if the witness' testimony was insufficient to establish that the video was a fair representation of the altercation between appellant and Quincy, the video would still be admissible as a silent witness. "Given an adequate foundation assuring the accuracy of the

_____

[2] Notably, appellant brings up this argument for the first time on appeal. At trial, she objected to the admission of the video based solely on the skips or lags in the video.

process producing it, the photograph [or videotape] should then be received as a so-called silent witness or as a witness which 'speaks for itself.'" *Ferguson*, 212 Va. at 746 (quoting 3 Wigmore, *Evidence* § 790, at 219-20 (Chadbourn rev. ed. 1970)); *see also Bennett v. Commonwealth*, 69 Va. App. 475, 487-88 (2018) (finding that a video admitted into evidence as a silent witness does not constitute hearsay unless it contains conduct that "is intended [by the actor] as an assertion" (quoting Va. R. Evid. 2:801(a))).  Coleman testified that Valero has surveillance cameras both inside and outside the store; that one of the outside cameras captured the incident, and that the video is "tamper-proof," meaning that sections of video cannot be added to or deleted from the original video.  A review of the video also shows that it is time-stamped and that it does not skip or miss time according to that stamp.  *See Brooks*, 15 Va. App. at 411.

In *Brooks*, this Court reviewed the introduction of video evidence at trial, holding that "[s]imply because portions of the tape . . . were out of focus or obscured does not render it unduly prejudicial." *Id.*  In the present case, appellant argues that the video is not a "fair and accurate depiction" because the video jerks or lags; however, the time stamp reveals that no sections of video are missing.  As in *Brooks*, while the Valero video is not of the highest quality, this does not render it inadmissible.  Again, appellant's attack on the quality of the video goes more to its weight rather than its admissibility.  *Church*, 71 Va. App. at 122-23.

We conclude that it was not an abuse of discretion for the trial court to admit the surveillance video into evidence.

## B.  Admissibility of the Knife

"All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of Virginia, statute, Rules of the Supreme Court of Virginia, or other evidentiary principles.  Evidence that is not relevant is not admissible." Va. R. Evid.

2:402. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence." Va. R. Evid. 2:401.

Appellant argues that the knife was not relevant because the Commonwealth did not establish that the knife found in Quincy's car was the same knife that was carried by appellant. Appellant correctly notes that she did not tell police or any other witness where the knife was, nor was she ever asked to describe or identify the knife's color, shape, or size. However, appellant did tell Sergeant Washburn that she approached Quincy with a "scalpel-type knife" in her hand. Officer E. Clark testified that when he watched the Valero video, he saw Quincy take an object from appellant and drop it in the driver's side door of his vehicle. Finally, both Sergeant Washburn and Officer E. Clark testified that they searched Quincy's car and found a knife in the driver's side door; they alternately described the knife as a "knife/razor-type cutting utensil" and as a "scalpel-type bladed object."

"Every fact, however remote or insignificant, that tends to establish the probability or improbability of a fact in issue, is admissible." *Epperly v. Commonwealth*, 224 Va. 214, 230 (1982) (citing *Stamper*, 220 Va. at 269). While appellant may argue that there was insufficient evidence to prove conclusively that the knife that was admitted was the same knife that appellant brandished at Quincy, this goes to the weight of the evidence, not its admissibility.

The finding of a "scalpel-type bladed object" in the location where a police officer saw Quincy drop an item he took from appellant, combined with appellant's statement that she was carrying a "scalpel-type knife," goes to the probability that appellant was indeed armed with a knife when she approached Quincy and L.P. The question of whether appellant was so armed is certainly relevant to the analysis of whether she acted with a "reckless disregard for human life"

as charged under Code § 18.2-371.1(B). Therefore, the trial court did not abuse its discretion in admitting the knife into evidence.

## C. Sufficiency of the Evidence

Appellant's third assignment of error alleges that "[t]he trial court erred in finding the evidence sufficient to convict [appellant] of felonious child abuse because of insufficient evidence of a willful act or omission and insufficient evidence of a reckless disregard for human life." A claim of insufficient evidence requires an evaluation of the evidence in the light most favorable to the Commonwealth, and this Court will reverse the trial court's judgment only "when its decision is plainly wrong or without evidence to support it." *Farhoumand v. Commonwealth*, 288 Va. 338, 351 (2014). Furthermore, this Court must not "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt," but instead must inquire "whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Williams v. Commonwealth*, 278 Va. 190, 193 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)).

Appellant was convicted under Code § 18.2-371.1(B), which reads in relevant part: "Any parent, guardian, or other person responsible for the care of a child under the age of 18 whose willful act or omission in the care of such child was so gross, wanton, and culpable as to show a reckless disregard for human life is guilty of a Class 6 felony." In order to sustain a conviction under this code section, "the Commonwealth must establish that the defendant, through her willful act or omission, created a situation placing the child at risk of actual physical harm." *Flowers v. Commonwealth*, 49 Va. App. 241, 247 (2007).

"A willful act is one 'which is intentional, or knowing, or voluntary, as distinguished from accidental.'" *Id.* at 248 (quoting *Ellis v. Commonwealth*, 29 Va. App. 548, 551 (1999)). Here, appellant's actions were clearly intentional; the evidence at trial established that she

approached Quincy with a blade in her hand and that she continued to attack him, both as L.P. lay alone on the pavement and as she later held the child in her arms.

Thus, the question is whether appellant's actions showed a reckless disregard for human life. The *mens rea* for felony child abuse "can be satisfied by a showing of criminal negligence on the part of the defendant." *Carosi v. Commonwealth*, 280 Va. 545, 553 (2010). This Court has noted that "criminal negligence may be found to exist when the defendant 'either knew or should have known the probable results of his[/her] acts.'" *Coomer v. Commonwealth*, 67 Va. App. 537, 546 (2017) (quoting *Wood v. Commonwealth*, 57 Va. App. 286, 298 (2010)). The Commonwealth must also show that the defendant was "aware that her conduct was likely to result in serious injury." *Mangano v. Commonwealth*, 44 Va. App. 210, 215 (2004). A "mere speculative possibility of harm alone" is not sufficient to sustain a conviction for felony child abuse. *Coomer*, 67 Va. App. at 551.

Code § 18.2-371.1 "proscribes advertence, not inadvertence." *Mangano*, 44 Va. App. at 216. Here, appellant argues that her actions were not willful within the meaning of Code § 18.2-371.1 because there was no probability of harm to L.P. when appellant left the baby on the ground while she chased Quincy with the knife, or when she struck at Quincy while holding L.P. Appellant cites *Ellis v. Commonwealth* for the proposition that the "willful act" forbidden under Code § 18.2-371.1 must be performed with the "knowledge that particular conduct will likely result in injury or illegality." *Ellis*, 29 Va. App. at 554. The *Ellis* Court found that the defendant was negligent but did not act "in *conscious* disregard" of the danger faced by her children when she forgot to turn off a gas stove burner and had not ensured that the smoke detectors in the home were in proper working condition. *Id.* at 555. Appellant's reliance on the inadvertent mistakes made by the defendant in *Ellis* is wholly unpersuasive here. In the present

- 9 -

case appellant herself actively created the danger that threatened L.P. by wielding a knife and threatening the person holding the child.

Virginia courts have reversed convictions for felony child abuse in situations in which the defendants could not reasonably have anticipated the danger faced by the children.[3] The danger of serious injury to L.P. in the present case, however, could reasonably be anticipated based on appellant's own misconduct. Here, the Valero video depicts appellant chasing Quincy, wildly swinging a knife. Appellant's own statements establish that she intentionally approached Quincy with a knife "out" in her hand while Quincy held a seven-month-old baby in his arms. "A picture may speak a thousand words," *Campbell v. Commonwealth*, 12 Va. App. 476, 484 (1991) (*en banc*), and a rational fact-finder viewing this video could conclude appellant's conduct was "so gross, wanton, and culpable as to show a reckless disregard for human life." Appellant knew or should have known that by using a knife to threaten someone holding a baby, there was a risk of actual physical harm to the baby. Even after L.P. struck the ground, appellant left her lying face down on the pavement to chase after Quincy, and after finally retrieving the baby, appellant continued to hit Quincy with her fist even with L.P. in her arms. Thus, a rational fact-finder could determine that her actions went beyond ordinary negligence and into the scope of criminal negligence. *See Flowers*, 49 Va. App. at 249 (the defendant believed that the juveniles in her

---

[3] *See, e.g., Morris v. Commonwealth*, 272 Va. 732, 740 (2006) (the defendant double-locked the door to her trailer before she and her two young children went to sleep, but the children awoke and went outside to play unsupervised); *Ellis*, 29 Va. App. at 555-56 (the defendant left her children alone in their apartment where she had inadvertently left a stove burner on, eventually igniting a fire); *Mangano*, 44 Va. App. at 21 (the defendant saw his fourteen-year-old son holding a rifle and told him to put the gun away, but left the room before his son accidentally shot another child; the defendant had no reason to believe the gun was loaded or that his son would disobey him); *White v. Commonwealth*, 68 Va. App. 111, 126 (2017) (the defendant's young son went outside and fell into the septic tank in their backyard while the defendant slept).

care had ingested drugs but waited three hours before contacting one of the children's parents; the defendant did not call for medical assistance and asked the parent not to contact police).

We conclude appellant's actions exhibited the requisite *mens rea* to uphold the conviction under Code § 18.2-371.1(B). "[O]ur Supreme Court has consistently considered the totality of a defendant's conduct and the circumstances surrounding it with respect to whether the evidence was sufficient to establish that an appellant's conduct was gross, wanton, and culpable." *Coomer*, 67 Va. App. at 549. When viewing the evidence as a whole and in the light most favorable to the Commonwealth, appellant's actions were sufficient for a rational fact-finder to conclude that appellant, through a willful act, placed L.P. at a distinct risk of actual physical harm and displayed a reckless disregard for human life. *See Flowers*, 49 Va. App. at 247.

### III. CONCLUSION

The trial judge did not abuse his discretion in finding that the Valero video had been sufficiently authenticated by Coleman's testimony and that a sufficient foundation had been laid for its admission into evidence. The trial judge also did not abuse his discretion in finding that the knife in Quincy's car was relevant and admissible.

The record is sufficient to support appellant's conviction for felony child abuse; the findings of the trial court were not plainly wrong or without evidence to support them.

For all these reasons, the ruling of the trial court is affirmed.

*Affirmed*.